IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CYNTHIA YOUNG BOLEK,

                Plaintiff,

                v.

CITY OF HILLSBORO, an Oregon municipal
corporation; RON LOUIE, an individual;
STEVE GREAGOR, an individual; and
MICHAEL BROWN, an individual;

                Defendants.

Case No. 3:14-cv-00740-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, Magistrate Judge.**

       Cynthia Young Bolek ("Bolek") brings this action against her employer, City of Hillsboro

("Hillsboro" or the "City"), and three individuals, Ron Louie ("Louie"), Steve Greagor ("Greagor"),

and Michael Brown ("Brown") (collectively "Defendants"). Bolek asserts retaliation claims for

reporting matters of public concern (42 U.S.C. § 1983), retaliation by a public employer (Oregon

Page 1 - FINDINGS AND RECOMMENDATION

Revised Statute ("ORS") 659A.203), whistleblowing (ORS 659A.199 and 659A.230), and opposing unlawful employment practices (ORS 659A.030(1)(f)). Bolek also alleges claims for Family Medical Leave Act interference and retaliation (29 U.S.C. §§ 2601-2654), Oregon Family Leave Act interference and retaliation (ORS 659A.150-186), disability discrimination and retaliation (ORS 659A.103-145), gender discrimination and retaliation (ORS 659A.030), and intentional infliction of emotional distress. The Court has original jurisdiction over Bolek's 42 U.S.C. § 1983 and Family Medical Leave Act claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Bolek's state law claims under 28 U.S.C. § 1367(a).

Pursuant to Federal Rule of Civil Procedure 56, the parties filed cross motions for summary judgment. Defendants seek judgment on all thirteen of Bolek's claims, and Bolek seeks judgment on ten of her thirteen claims. The Court heard oral argument on the parties' cross motions for summary judgment. For the reasons explained below, the district judge should grant Defendants' Motion for Summary Judgment, and deny Bolek's Motion for Partial Summary Judgment.

## FACTS AND PROCEDURAL HISTORY

Bolek has been employed by the Hillsboro Police Department since 2001, and currently works as the Support Services Division Manager. (Andrew Altschul Dec. Ex. A (Cynthia Bolek Dep. 21:3-22:13, 43:5-7, July 14, 2015 (hereinafter "Bolek Dep.")), Feb. 24, 2016.) Bolek oversees the Records Division, which handles public records requests, provides support services for police officers, and compiles reports for the state; the Property and Evidence Division, which handles evidence obtained from police officers; Risk Management; and Labor Relations. (Bolek Dep. 29:4-30:2, 30:11-17, 32:9-20 33:2-4, 33:8-22, 34:8-35:7, 44:20-45:2.) In the department hierarchy, the only positions above Bolek are that of the deputy police chief and the police chief. (Karen M.

Vickers Decl. Ex. 3 at 16, Feb. 24, 2016.) In the spring of 2013, the relevant organizational chart showed that Bolek's position was directly under the police chief. It also showed that under Bolek were the positions "Professional Standards" and the "Records Supervisor," which both had one or two positions below them. (Vickers Decl. Ex. 3 at 16.)

During all relevant times, Bolek reported directly to the police chief. (Bolek Dep. 41:25-42:5.) Bolek received exemplary reviews and has been recognized twice for significant contributions to the labor and employee relations field. (Bolek Dep. 51:20-52:1; Cynthia Bolek Decl. ¶ 2, Feb. 24, 2016.) In addition, the City managers value and respect Bolek's work. Specifically, Robert Hammond ("Hammond"), the City's Human Resources Manager, stated that Bolek "works really hard" and is "extremely intelligent," "impressive," well-versed in handling labor relations issues, and trustworthy. (Altschul Decl. Ex. B. (Robert Hammond Dep. 48:4-15, July 17, 2015 (hereinafter "Hammond Dep.").) Similarly, City Manager Brown described Bolek as "exceptionally bright," "impressive," "very articulate," talented, and truthful. He noted that Bolek has a "deep knowledge of . . . her work and the police department," a strong background in human resources and the law, and is a "great resource" with an "exceptional" work ethic. (Altschul Decl. Ex. C (Michael Brown Dep. 25:11-26:7, 28:13-22, July 16, 2015 (hereinafter "Brown Dep.").) Assistant City Manager Greagor described Bolek as "a very talented professional" who is "intelligent" and "contributed greatly" to the organization. He also confirmed that Bolek is trustworthy and has a great work ethic. (Altschul Decl. Ex. E (Steven Greagor Dep. 21:11-19, July 16, 2015 (hereinafter "Greagor Dep.").)

On December 5, 2012, Bolek suffered a cardiac arrest. (Bolek Dep. 75:2-4.) As a result of her cardiac arrest, Bolek had difficulty regulating her blood pressure and getting enough oxygen. She also suffered from an elevated heart rate, which resulted in fatigue. (Bolek Dep. 75:2-17, 81:7-15.)

Initially, the City provided Bolek with eight weeks of medical leave because she was unable to work or drive. (Bolek Dep. 78:22-79:10.) In early February 2013, Bolek was cleared by her doctor to work twenty hours a week from home. (Bolek Dep. 80:25-81:5.) The City approved intermittent medical leave for Bolek, including flexible work hours and the ability to work from home. Also in February 2013, Bolek's doctor released Bolek to participate in meetings at the office with the department's senior officials, informally known as the executive team, or "E-team." (Bolek Dep. 82:16-21). By the middle of March 2013, Bolek was working 30 hours per week from home. (Robert Hammond Decl. ¶ 10, Feb. 24, 2016.) By the end of April 2013, Bolek was cleared to drive, and in June 2013 she returned to full-time work. (Bolek Decl. ¶¶ 5-6.)

In March 2013, Brown appointed former Police Chief Ron Louie to the position of Interim Police Chief. (Brown Dep. 78:15-17, 81:13-25.) The police chief reports directly to the city manager. (Brown Dep. 80:21-81:2.) Brown and Louie anticipated that the assignment would last five to seven months. (Brown Dep. 81:7-18.)

After Louie became Bolek's direct supervisor, Bolek talked to him about her health issues and her accommodations, including her reduced work schedule. (Bolek Dep. 117:18-24; Altschul Decl. Ex. H.) While Louie appeared to be supportive of Bolek, he asked questions about her restrictions and her work hours. (Altschul Decl. Ex. D. (Ronald Jay Louie Dep. 97:4-99:20, July 17, 2015 (hereinafter "Louie Dep.")); Bolek Dep. 117:25-118:1,120:25-122:11.) Ultimately, the questions became persistent enough that Bolek assured Louie that she was working in compliance with her doctor's orders. (Bolek Dep. 120:25-121:12.)

Bolek and Louie worked together until mid-April 2013, when Bolek opposed Louie's decision to appoint former Beaverton Police Chief Dave Bishop to assist with the Community

Page 4 - FINDINGS AND RECOMMENDATION

Enforcement Team ("CET"), a group of all female employees. (Bolek Dep. 165:16-25, 167:7-168:4; Louie Dep. 41:20-42:5, 14-18.) Bolek had learned that several of the CET employees were concerned about Bishop's appointment, given Bishop's history of alleged sexual harassment. Bolek reported those concerns to Louie on April 16, 2013. (Bolek Dep. 165:16-25, 171:25-173:10, 178:20-179:14.) Although Louie was aware of Bishop's history, Louie was upset with Bolek's intervention and the fact that her opposition resulted in Louie having to withdraw Bishop's appointment. (Bolek Dep. 161:11-15; Louie Dep. 41:20-42:5, 14-18.) City Attorney Akin Blitz called Bolek to tell her that Louie was angry at her over the Bishop situation. (Bolek Dep. 68:24-69:2, 69:16-24, 173:23-174:17.) Blitz told Bolek she needed to "take care of this" or she would be "in trouble." (Bolek Dep. 175:13-25.)

Bolek had opposed other City practices during her career. Throughout 2012-2013, Bolek opposed the City's refusal to provide a group of all female professional employees with a cost-of-living raise, when all other employee groups received raises. (Bolek Dep. 18:17-23, 59:9-20, 61:8-12, 63:5-19, 65:17-67:21, 305:6-307:15.) Bolek also opposed disciplinary practices that resulted in female police officers being subjected to substantially higher scrutiny than their male peers. (Bolek Dep. 64:9-17, 65:25-67:3, 200:2-20, 248:17-249:3, 252:15-24, 304:23-306:21, 310:8-15.)

On May 2, 2013, Louie emailed Administrative Services Manager Denise Carlson ("Carlson") about his proposed reorganization plan, and Carlson believed the proposed plan would detrimentally impact Bolek. (Louie Dep. 66:21-67:23, 69:15-71:15; Denise Carlson Decl. ¶¶ 5-6, Feb. 23, 2016.) Among other changes, Louie proposed to move authority for the Records Division from Bolek to Carlson, and to change Bolek's reporting obligations from the police chief to the deputy police chief. (Carlson Decl. ¶ 5; Mark Bonnett Decl. ¶ 7, Feb. 24, 2016.) Carlson advised

Page 5 - FINDINGS AND RECOMMENDATION

Louie that his proposed changes were unnecessary. (Louie Dep. 66:21-24, 69:15-71:16, 72:19-73:1, 73:22-74:4; Hammond Dep. 89:10-16; Carlson Decl. ¶ 5.) Carlson forwarded information about Louie's proposed reorganization to Deputy Police Chief Mark Bonnett ("Bonnett"), who also advised Louie that the changes he proposed were not necessary. (Hammond Dep. 89:10-16; Louie Dep. 72:23-73:1, 73:22-25; Bonnett Decl. ¶¶ 7-8.) In addition, Bonnett told Louie that removing Bolek's duties could be perceived as an unlawful response to her medical condition and medical leave, her gender, and her opposition to gender-related issues. (Bonnett Decl. ¶ 8; Hammond Dep. 89:10-23.)

On May 6, 2013, during communications with CityCounty Insurance Services adjuster Amber Hunt regarding another matter, Blitz confirmed to Hunt that Bolek was likely to be "removed or moved" by the City and that Louie was "looking at options to move" Bolek. (Altschul Decl. Exs. J, AA.) That same day, Louie arrived at a regularly scheduled meeting of the E-team, consisting of Louie, Bolek, Bonnett, Carlson, Commander John Schmerber ("Schmerber"), and Commander Mitch Rademacher ("Rademacher"). At the meeting, Louie was "yelling," "angry," "hostile," and "out of control." (Bolek Dep. 184:12-19, 163:3-5; Hammond Dep. 61:9-62:6, 62:11-15, 74:5-11; Brown Dep. 63:11-17; Louie Dep. 74:10-11.) The team was upset by Louie's behavior. (Hammond Dep. 61:9-62:6, 62:11-15; 74:5-11; Brown Dep. 63:11-17; Bonnett Decl. ¶¶ 10-11; Carlson Decl. ¶ 8.)

At the meeting, Louie announced that he intended to "reorganize" the police department management team and remove Bolek's responsibilities, reassign her subordinates to other managers, and change her supervisory structure so that she reported directly to one of her peers rather than the police chief. (Bonnett Decl. ¶ 11; Carlson Decl. ¶ 9; Altschul Decl. Ex. BB at 12, 14, 35; Bolek Dep. 228:3-18, 228:3-18.) According to Rademacher, Louie made it clear this was not a suggestion or proposal, and there would be no further discussion. (Altschul Decl. Ex. BB at 37.) Louie yelled

Page 6 - FINDINGS AND RECOMMENDATION

profanities and told Bolek that she was done and "didn't need to be there." (Bolek Dep. 216:6-217:14.) Louie was agitated to a point that he was spitting as he spoke. (Bolek Dep. 163:3-5; Hammond Dep. 89:24:90:2; Carlson Decl. ¶ 12.) Louie later recognized that his conduct was "insulting," his demeanor "unacceptable," he was "pissed," and his body language was "forceful." (Louie Dep. 93:7-12; Hammond Dep. 87:15-22.)

Bolek was humiliated by Louie's conduct and devastated because she believed she was being demoted. She cried and her heart raced. (Carlson Decl. ¶¶ 10-12; Bonnett Decl. ¶ 12; Bolek Dep. 216:6-223:25; Louie Dep. 77:21-22, 80:18-23.) Bolek, however, continued to take notes, which was her normal practice at the E-team meetings. Louie further embarrassed Bolek by yelling at her for taking notes and requiring her to read them aloud back to him. (Bolek Dep. 218:1-17; Louie Dep. 78:4-20; Carlson Decl. ¶ 11; Bonnett Decl. ¶ 13.) Louie said that he was reassigning Bolek's work because of her medical condition and, unless she could perform full-time work, she did not need to be working in the office. (Bolek Dep. 162:19-163:5; Bonnett Decl. ¶¶ 15-16; Carlson Decl. ¶¶ 13, 15.) Bolek asked Louie if they could discuss the issue privately, but he refused, saying he was making this change for her own good because of her medical condition. (Carlson Decl. ¶ 13; Altschul Decl. Ex. BB at 35; Bolek Dep. 184:5-20, 185:3-10.)

Both Bonnett and Carlson tried to intervene on Bolek's behalf during the meeting. (Carlson Decl. ¶¶ 10, 12; Bonnett Decl. ¶¶ 12, 14.) At one point, Carlson put her arms around Bolek in an attempt to physically shield her from the verbal abuse. (Carlson Decl. ¶ 12.) Bonnett moved so he was positioned between Louie and Bolek. (Bonnett Decl. ¶ 14.) When Bonnett reminded Louie that he could not hold Bolek's medical condition against her, Louie responded that he could do what he wanted. (Bolek Dep. 216:6-221:22; Hammond Dep. 88:17-89:4; Carlson Decl. ¶ 15; Bonnett Decl.

¶¶ 15-16; Altschul Decl. Ex. BB at 9, 10, 12.) Eventually, Bolek asked if she could have her job back when she returned to work, to which Louie responded: "Maybe, maybe not." (Bolek Dep. 216:6-221:22; Carlson Decl. ¶ 14.) Rademacher was shocked and upset by Louie's conduct, and he walked out of the meeting. (Altschul Decl. Ex. K; Hammond Dep. 84:11-85:7.)

Immediately following the meeting, Bonnett reported Louie's conduct to Hammond, Brown, and Greagor. (Hammond Dep. 59:19-60:6; Brown Dep. 62:25-62:25-63:4.) The E-team met with the City managers and described what happened in the meeting. Hammond promised to look into it, and Brown agreed to advise Louie his behavior was "not okay." (Hammond Dep. 61:9-62:6, 67:14-68:1.) Within a few hours of the meeting, Louie dropped his proposed reorganization plan, and no such changes ever took effect. (Bolek Dep. 162:13-14 ("I think from the start, from the start to the finish was about just under three hours.").) Later, when Brown spoke with Louie, Louie told Brown that he changed Bolek's job responsibilities because he thought she was working too much in light of her medical condition. (Brown Dep. 65:20-67:3.) Louie explained that he believed it was his prerogative to "relieve" Bolek of her workload because she was a workaholic and needed to be home convalescing. (Louie Dep. 97:4-25.) Louie thought Bolek should "stay at home and not be bothered by anybody from the police department." (Louie Dep. 98:20-99:16.) Louie imagined that work would "create stress on her and on her body, and make matters worse, and exacerbate her medical condition." (Louie Dep. 99:17-20.) Changing Bolek's job made sense to Louie because, if she was only working half a day a week in the office, she did not need to report to the chief anymore. (Louie Dep. 84:22-25.) Louie acknowledged, however, that Bolek never asked for assistance or expressed concern about her workload, and that she continued to handle her duties appropriately. (Louie Dep. 98:3-10.)

Page 8 - FINDINGS AND RECOMMENDATION

On May 9, 2013, Hammond asked Bolek if she intended to request an official investigation by Human Resources. (Hammond Dep. 76:8-77:2, 77:23-78:6; Altschul Decl. Ex. K at 2.) Two days later, on May 11, 2013, Bolek confirmed in an email to Hammond that the point of her May 6 meeting with Hammond was to report that Louie engaged in "harassment, discrimination, and retaliation," which the City should investigate. (Hammond Dep. 77:23-78:8; Altschul Decl. Ex. K at 1.) Bolek explained that "the stress of Monday's events" had "caused [her] heart rate to skyrocket back to the point where [she] temporarily lost [her] ability to drive." (Hammond Dep. 77:23-78:8; Altschul Decl. Ex. K at 1.) Hammond did not doubt the veracity of Bolek's statements regarding the physical effects she suffered due to the meeting. (Hammond Dep. 78:14-79:7.) Hammond believes Bolek experienced emotional stress after the May 6 meeting and that Louie's email apology was not sufficient and did not undo the harm Bolek suffered. (Hammond Dep. 67:4-13, 93:7-14, 93:18-21.)

Subsequently, Hammond conducted an interview with each of the meeting attendees. In these interviews, Hammond learned that Bonnett had advised Louie before the May 6 meeting that he should not reorganize the department in light of Bolek's protected status. (Hammond Dep. 88:17-89:23.) Hammond also discovered that Bonnett and Carlson advised Louie before his announcement that the proposed reorganization was not necessary, and they specifically advised Louie against such action. (Hammond Dep. 89:10-16; Louie Dep. 66:21-24, 69:15-71:16, 72:19-73:1, 73:22-74:4.) Hammond also confirmed that Bolek, Bonnett, Rademacher, and Schmerber all believed that Louie's proposed reorganization of Bolek's duties was a permanent change in her responsibilities. (Hammond Dep. 90:14-16, 92:5-11; Altschul Decl. Ex. BB at pg. 35; Carlson Decl. ¶ 17.) The City's investigation revealed that Louie had no basis for his concerns about Bolek performing her duties as required. (Hammond Dep. 73:13-17.) Brown further reiterated that he had never heard any

concerns or complaints about Bolek's performance. (Brown Dep. 29:21-24.) Louie acknowledged that he never heard anyone share negative comments about Bolek, nor was he aware of any concerns about her performance. (Louie Dep. 26:9-16.)

At the conclusion of its investigation, the City found evidence that Louie singled out Bolek because she took protected leave and because of her medical condition. (Hammond Dep. 103:9-19.) According to the final investigation report, it "appears that Bolek's normal duties were proposed to be reassigned temporarily by Louie during the May 6 meeting because he believed Bolek overworked herself and there was too much she was required to do."(Altschul Decl. Ex. BB at 4.) The final report also noted there is "no evidence" of a performance-related problem that justified reassignment. As a result, the City found Louie's "proposed reassignment could also have the appearance of retaliation against Bolek for taking protected leave" and that "the underlying facts could support an allegation of discrimination by Louie against Bolek for taking protected medical leave and/or because of her disability." (Altschul Decl. Ex. BB at 4.) The report concluded that because there was "some evidence Louie singled out Bolek out [sic] because she took protected leave and/or because of her medical condition," he should receive "a written reprimand for potentially interfering with Bolek's right to be on light-duty assignments as part of her protected leave status and potentially discriminating against her because of her current medical condition." (Altschul Decl. Ex. BB at 4.) Martin, who drafted the final investigation report, stated that she would not have recommended discipline for Louie if Louie did nothing wrong. (Altschul Decl. Ex. F. (Heather Martin Dep. 20:3-22, 22:9-11, Oct. 28, 2015 (hereinafter "Martin Dep.")); Hammond Dep. 82:4-8, 83:2-7, 18-20.)

After the City completed its investigation in July 2013, Hammond met with Bolek and advised her that the City's investigation concluded that Louie should receive a written reprimand for

potentially interfering with Bolek's protected medical leave, and a written reprimand for potentially discriminating against her because of her disability, but only if he was still in his position. (Hammond Dep. 101:8-25, 97:18-98:17.) However, Louie did not receive any discipline, and was never apprised of the results of the investigation, because Brown decided to allow Louie to resign from his interim tenure as chief a few weeks before the investigation report was completed. (Brown Dep. 76:12-77:2.6.)

In July 2013, the City declined Bolek's request to compensate her for the physical and emotional damage that she suffered as a result of Louie's conduct at the May 6 meeting. (Hammond Dep. 67:4-13, 79:4-7; Altschul Decl. Ex. M.) Specifically, Bolek alleged that she was required to take additional leave as a direct consequence of the physical setbacks she suffered due to Louie's conduct, and the City denied Bolek's request to have 100 hours of leave reinstated to her leave bank. Hammond told Bolek via email that "the City does not intend to provide any type of financial remedy or damages as a result of this incident." (Hammond Dep. 105:14-106:5, 106:16-107:4, 109:2-4; Altschul Decl. Ex. M.) The City's reasons for declining to replenish her leave bank or provide a financial remedy to Bolek was because doing so would set a "dangerous precedent." (Hammond Dep. 109:5-110:6.)

While Bolek continued to be upset about the City's refusal to reinstate her leave, she was hesitant to press the issue because she was under investigation related to threatened claims by a terminated employee, Ben Romero. (Bolek Decl. ¶ 11.) Bolek feared that if she pursued her rights in connection with the May 6 incident, it could lead to retaliation in connection with the Romero investigation. (Bolek Decl. ¶ 11.) Bolek was also sensitive to the fact that tort claim notices and lawsuits are public, and she did not want to make a "federal case" out of this matter, but she wanted

fair compensation for the harm she suffered, without triggering more retaliatory acts. (Bolek Dep. 258:11-25; Hammond Dep. 122:3-13.) Accordingly, after Bolek was cleared of allegations of wrongdoing related to Romero in October 2013, Bolek's attorney contacted City officials about resolving her complaints informally. (Hammond Dep. 50:20-51:7.) Shortly after, on November 1, 2013, the parties entered into a tolling agreement and agreed to pursue mediation. (Hammond Dep. 138:20-139:3, 140:4-14.) The parties agreed to toll the statute of limitations on Bolek's tort claim notice requirement until 30 days after dismissal of the Romero case. (Brown Dep. 99:16-20, 100:1-13.)

Bolek alleges that once the City learned she intended to pursue claims, she began hearing comments that City leaders were shocked and angry, and she started experiencing additional acts of retaliation. Specifically, Bolek alleges that the mayor told Bolek that she was "overpowering" and "too aggressive" for the men in the office. She alleges that she was directed by the mayor that she should take a "long term" leave of absence. (Bolek Dep. 274:11-275:2.) She alleges that Greagor and others pulled her off projects, or left her off important communications related to work under her purview. (Altschul Decl. Ex. R.) Bolek felt ostracized by management, and believed her work hours and timesheets were being scrutinized. (Bolek Dep. 317:13-318:18.) Bolek's supervisor told her that City management wants her "head on a platter." (Bolek Dep. 282:5-10.) Bolek was reluctant to file an official complaint regarding the alleged retaliatory conduct, in light of the scheduled mediation between her and the City relating to the May 6 meeting. (Bolek Decl. ¶ 15.)

On April 9 and 15, 2014, Bolek sent emails to Hammond describing the retaliation she was experiencing. (Bolek Decl. ¶ 17; Altschul Decl. Exs. P, Q.) On April 28, 2014, at Hammond's direction, Bolek sent a third email directly to Martin regarding her concerns. (Altschul Decl. Ex. R.)

In the Martin communication, Bolek provided additional details about the alleged retaliatory actions she had experienced since notifying the City in October 2013 of her intention to pursue her claims. (Bolek Decl. ¶ 17; Altschul Decl. Ex. R.) That same day, Bolek also sent the City a tort claim notice, further describing her claims related to the retaliation she experienced by Louie due to her medical condition, as well as her prior opposition to gender discrimination. (Altschul Decl. Ex. S.) At that time, the City withdrew from the mediation process, and refused to engage in any further discussion with Bolek related to her complaints. (Bolek Decl. ¶ 18.)

On receipt of Bolek's April 2014 retaliation complaint, the City handed the matter to Martin, with Hammond taking no role in the process. (Hammond Dep. 161:2-4.) Martin quickly concluded that "[t]here was nothing on the face of this complaint to investigate." (Martin Dep. 36:1-22, 37:24-38:13.) Martin did not interview the individuals who could confirm or refute Bolek's complaints of retaliation. (Martin Dep. 54:19-55:19, 50:5-53:2.) According to Martin, Bolek's complaints, even if true, could not constitute retaliation because Bolek did not suffer an adverse employment action. (Martin Dep. 28:20-29:25, 34:15-24, 55:2-11; Altschul Decl. Ex. T.) Bolek maintains that rather than investigate her allegations, Martin focused only on whether Bolek satisfied her burden to produce evidence of an employment-related harm. (Hammond Dep. 167:24-169:9; Martin Dep. 36:1-22, 54:19-55:19.)

Subsequently, Martin engaged a former FBI agent, Scott Jensen, to provide a second opinion on the issue of whether the City should investigate Bolek's complaints. (Altschul Decl. Ex. G (Scott Jensen Dep. 11:11-21, 12:11-17, 43:1-44:8, Dec. 7, 2015 (hereinafter "Jensen Dep.")); Martin Dep. 31:3-5, 37:3-6, 38:15-25; Hammond Dep. 162:22-163:7.) Jensen was tasked with reviewing Bolek's complaint to evaluate whether Bolek presented evidence that she had suffered an adverse

employment action to justify an investigation. (Jensen Dep. 27:23-28:6, 43:4-44:8; Martin Dep. 30:25-31:7.) Jensen did not interview the alleged wrongdoers, or any of the witnesses named by Bolek. (Martin Dep. 44:6-12; Jensen Dep. 42:2-17.)

Jensen determined that Bolek's complaints were without merit, because "[n]othing in the documentation provided by [Bolek] or in the information she offered during her interview suggests her rights under the FMLA/OFLA were ever abridged." (Altschul Decl. Ex. CC at 8.) Jensen dismissed Bolek's complaints of retaliatory communications, because "[n]one of the opinions expressed by others about [Bolek] has had any impact on [Bolek's] performance evaluation, nor have they affected her pay. By [Bolek's] own account, these comments did not inhibit her ability to apply for and be selected for positions within city government that would have afforded her a promotion." (Altschul Decl. Ex. CC.) In considering Bolek's claim about being bypassed and ostracized on certain work projects, Jensen found her complaints without merit because the decisions at issue did not affect her "pay or promotion potential, nor did they impact her performance evaluations." (Altschul Decl. Ex. CC.) As for the comment that City management wanted her head on a platter, Jensen dismissed the idea that Bolek had "ever actually been in fear of losing her position." (Altschul Decl. Ex. CC.)

Following the Martin/Jensen review, Martin drafted a report for Bolek. In the report, Martin stated that an investigation occurred. (Martin Dep. 44:14-45:9; Altschul Decl. Ex. T.) Specifically, Martin advised Bolek that "the investigator concluded – and our office concurs – that there is no evidence . . . showing you were disciplined, demoted, given a bad performance review, had pay reduced or had any other adverse employment action taken against you." (Altschul Decl. Ex. T.) As a result, Martin informed Bolek that she was without recourse. (Altschul Decl. Ex. T.)

Page 14 - FINDINGS AND RECOMMENDATION

Bolek was upset by the City's handling of her complaints, as it did not follow standard procedures. City policy requires that investigations be handled in a specific manner, as described in its general harassment policy, City Policy 7.4. (Altschul Decl. Ex. U.) The harassment policy includes a provision prohibiting employees from "engaging in any actions that are or may be perceived by a reasonable person as retaliatory." Prohibited activities include making offensive or derogatory comments based on protected categories, as well as actions that "explicitly or implicitly ridicule, mock, deride or belittle any person." When an employee reports conduct pursuant to this section, policy requires a complete investigation, including an interview of the alleged wrongdoer and a review of all of the facts, regardless of harm:

> The first pre-investigation step will be to inquire of all persons reporting as to whether the record now includes all allegations of harassment. The investigation will be conducted promptly on a priority basis. The investigation will be directed at ascertaining the facts concerning the allegations.
>
> The investigator will advise the alleged harasser of the allegations against him or her and will afford that person an opportunity to reply orally or in writing. The individual will also be advised that any retaliatory conduct will be subject to disciplinary action regardless of allegations of harassment.
>
> . . . .
>
> The report will also include any recommendations to remedy any harm that was suffered if the evidence shows that the employee alleged to have been affected by harassment was injured or harmed. The investigator will notify the complainant and the alleged harasser of the investigation results and the recommended remedy, if any.

(Altschul Decl. Ex. U.)

City management acknowledged that an investigation typically includes interviews of the parties, witnesses, and alleged wrongdoers. (Hammond Dep. 134:8-135:24, 137:16-22.) Brown agreed that he likely should have been interviewed given Bolek's claims against him. (Brown Dep.

105:4-16.) Martin acknowledged that in other investigations she conducted on behalf of the City, she interviewed people other than just the complaining employee. (Martin Dep. 71:11-15.) Employees who offered to speak on Bolek's behalf as witnesses to the alleged retaliatory actions were surprised they were not interviewed. For example, Rademacher told Hammond that he was concerned about Martin's findings and the investigation. (Hammond Dep. 166:12-18.)

Bolek continues to work for the City as its Support Services Division Manager. (Bolek Dep. 43:5-7.) Bolek never experienced a change in the terms and conditions of her employment, never received a negative evaluation, and she was never denied a promotion. In the fourteen years Bolek has worked for the City, her annual salary has increased from $47,000 to $121,000. (Bolek Dep. 74:8-10; Vickers Decl. Ex. 1 at 115.)

On May 2, 2014, Bolek filed her Complaint in federal court, alleging twelve (and later thirteen) claims for relief.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED R. CIV. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All material facts are resolved in a light most favorable to the nonmoving party. *Id*. at 331. The court must accept all evidence and make all inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

//

//

Page 16 - FINDINGS AND RECOMMENDATION

## DISCUSSION

I.    **Summary of Bolek's Claims**

In her First Amended Complaint, Bolek alleges:

•    Two claims under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, and two parallel claims under the Oregon Family Leave Act ("OFLA"), ORS 659A.150-659A.186, for interference and retaliation;

•    Two claims under 42 U.S.C. § 1983 for violations of her First Amendment right to report matters of public concern;

•    Five state law retaliation claims in violation of ORS 659A.203 (Public Employer), ORS 659A.199 (Whistleblowing), ORS 659A.030(1)(f) (Opposing Unlawful Employment Practices), ORS 659A.230 (Whistleblowing), and ORS 659A.109 (Disability);

•    One state law discrimination claim in violation of ORS 659A.030 (Gender Discrimination); and

•    One state common law claim for intentional infliction of emotional distress ("IIED"), arising from the May 6, 2013 meeting.

With the exception of one § 1983 claim against the individual defendants, Bolek asserts all of her claims against the City only. In addition, Bolek has withdrawn her gender discrimination claim, and her § 1983 claim against the City. (*See* Pl.'s Opp. 49 ("Bolek agrees that she cannot maintain her Section 1983 claims against the City."); Pl.'s Opp. 25 ("Bolek concedes that she does not have sufficient grounds upon which to assert discrimination claims, as she has not experienced a tangible change in the terms and conditions of her employment.").) Accordingly, in light of Bolek's concessions, the Court recommends that the district judge grant summary judgment on Bolek's first (42 U.S.C. § 1983) and seventh (ORS 659A.030) claims.

Below, the Court considers Bolek's eleven remaining claims: one § 1983 speech claim against the individual defendants, five state law retaliation claims, four medical leave claims, and

one common law IIED claim. For the reasons stated, the Court recommends that the district judge grant Defendants' motion for summary judgment on all of Bolek's claims.

## II.    First Amendment Claim

Bolek pleads her second claim for relief against the individual defendants, claiming retaliation for reporting matters of public concern in violation of 42 U.S.C. § 1983. Section 1983 provides a private right of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must prove two essential elements: (1) a federal constitutional or statutory right was violated; and (2) the alleged violation was committed by a person acting under the color of state law. *See Devereaux v. Abbey,* 263 F.3d 1070, 1074 (9th Cir. 2001). There is no dispute that the named individual defendants were acting under color of state law. Rather, the parties disagree about whether the individual defendants retaliated against Bolek for protected speech, in violation of the First Amendment.

Bolek alleges that the individual defendants "act[ed] individually or in concert, based on the authority they possessed due to their positions within the City," to deprive her of her First Amendment rights. (FAC ¶ 54.) Bolek claims "she has three viable 1983 claims against the individual defendants." (Pl.'s Opp. 49.) Specifically, Bolek contends that Greagor and Brown retaliated after she: (1) spoke out about Louie's conduct at the May 6 meeting, and (2) filed a tort claim notice. (Pl.'s Opp. 49.) In addition, Bolek maintains Louie retaliated after she spoke out "about Dave Bishop's employment." (Pl's Opp. 49.) Bolek alleges that after reporting these serious unlawful activities on matters of public concern, "Hillsboro attemt[ed] to demote [her] and /or remove her from employment, take away her job duties, and set her up as a scapegoat for an

Page 18 - FINDINGS AND RECOMMENDATION

uncomfortable situation for the City." (Am. Compl. ¶¶ 43-44.) Bolek alleges eleven adverse actions by the individual defendants. (Am. Compl. ¶ 45.) The individual defendants move for summary judgment on the § 1983 claim.

The Ninth Circuit applies a five-factor test to evaluate First Amendment retaliation claims. *See Eng v. Cooley*, 552 F.3d 1062, 1070-71 (9th Cir. 2009). First, plaintiff bears the burden of proving that: (1) she spoke on a matter of public concern, (2) she spoke as a private citizen rather than a public employee, and (3) the relevant speech was "a substantial or motivating factor in the adverse employment action." *Id.*; *see also Anthoine v. N. Cent. Cty's Consortium*, 605 F.3d 740, 747 (9th Cir. 2010) ("The First Amendment shields a public employee if he speaks as a citizen on a matter of public concern.") If plaintiff establishes such a prima facie case, the burden of proof shifts to the public employer, to show: (4) "the state had an adequate justification for treating the employee differently from other members of the general public," or (5) "the state would have taken the adverse employment action even absent the protected speech." *Eng*, 552 F.3d at 1070-72. All of the *Eng* "factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc). Because "all five factors are independently necessary," a reviewing court may address a potentially dispositive factor first rather than addressing each factor sequentially. *Id*.

The individual defendants contend that Bolek is unable to prove a prima facie case for First Amendment retaliation by a public employer. Specifically, they argue that Bolek spoke in her capacity as a public employee, not as a private citizen. (Defs.' Combined Resp. and Reply 35-39.) The individual defendants also argue that the subject of Bolek's speech did not involve matters of public concern. (Defs.' Combined Resp. and Reply 39-41.) In addition, the individual defendants

maintain that the City did not take any adverse employment action against Bolek, and there is no causal link between any protected speech and any alleged adverse action. (Defs.' Combined Resp. and Reply 42-47.) Finally, the individual defendants assert qualified immunity from Bolek's § 1983 claim. (Defs.' Combined Resp. and Reply 47-50.)

### A.    Matters of Public Concern

The individual defendants argue that Bolek's speech concerning alleged interference with, and retaliation for, her exercise of FMLA rights was not a matter of public concern, because those complaints related to Bolek's personal treatment and were communicated privately, not publicly. (Defs.' Mot. Summ. J. 48-50.) Similarly, the individual defendants maintain that Bolek's filing of a tort claim notice, which allegedly resulted in a "sham" investigation, implicated only private concerns about her alleged unlawful treatment. With regard to her complaints about Bishop, the individual defendants argue that Bolek expressed those concerns in a private, rather than public, forum, by copying an attorney on the emails to ensure the content would be protected from public disclosure. (Defs.' Mot. Summ. J. 50.)

Speech involves a matter of public concern when it fairly can be said to relate to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Courts evaluate the nature of the speech by looking at "the content, form, and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987); *see also Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (noting that the Ninth Circuit "relie[s] on a generalized analysis of the nature of the speech" under the three *Connick/Rankin* factors). The content of a statement reflects a matter of public concern when the speech involves "'issues about which information is needed or appropriate to enable the members

Page 20 - FINDINGS AND RECOMMENDATION

of society to make informed decisions about the operation of their government.'" *Id*. at 710 (quoting

*McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).

"On the other hand, speech that deals with 'individual personnel disputes and grievances' and

that would be of 'no relevance to the public's evaluation of the performance of governmental

agencies' is generally not of 'public concern.'" *Id*. (quoting *McKinley*, 705 F.2d at 114). The form

of a statement reflects a matter of public concern when the speech is made in a public forum as

opposed to a private conversation. *Id*. at 714. Finally, the context of a statement reflects a matter of

public concern when the speech is motivated by a desire to "'bring to light actual or potential

wrongdoing or breach of public trust.'" *Id*. at 715 (*quoting Connick*, 418 U.S. at 148). Content is "the

greatest single factor in the *Connick* inquiry." *Id*. at 710. However, "[i]n a close case, when the

subject matter of a statement is only marginally related to issues of public concern, the fact that it

was made due to a grudge or other private interest or to co-workers rather than to the press may lead

the court to conclude that the statement does not substantially involve a matter of public concern."

*Johnson v. Multnomah Cty., Or.*, 48 F.3d 420, 425 (9th Cir. 1995). The Court decides as a matter

of law whether the employee's speech involved a matter of public concern. *Connick*, 461 U.S. at 148

n.7.

### 1.    Bolek's Speech in Opposition to Louie's Conduct at the May 6 Meeting

To determine whether Bolek's speech in opposition to Louie's behavior at the May 6 meeting

implicated matters of public concern, the Court considers its content, context, and form. *Rankin*, 483

U.S. at 384-85. With regard to the content, Bolek presented evidence (emails) that she opposed

Louie's attempts to demote her, as well as the City's decision not to reprimand or otherwise sanction

Louie for his conduct. The speech at issue reflects a disagreement between Bolek and City officials

regarding the nature and significance of Louie's conduct toward Bolek. The content of the speech relates only tangentially to matters of public concern, and does not involve "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *McKinley*, 705 F.2d at 1114 (internal quotation marks and citation omitted).

With respect to the form, Bolek's emails were internal communications, and Bolek made no attempt to disclose publicly the content of her internal emails. While this factor is not dispositive (*Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006)), it does weigh against a finding that the speech was intended to alert the public to an important governmental matter.

Regarding the context of Bolek's emails, the Court must consider the purpose of her speech. *See Desrochers*, 572 F.3d at 715. There is no evidence that Bolek's emails concerning Louie were made for the purpose of bringing to light any systemic wrongdoing by the City that implicates a public concern for the community. Instead, the record supports a finding that Bolek spoke up in an attempt to protect her own rights. While such an interest is important, the context of Bolek's speech weighs against a finding that her speech was a matter of public concern.

After assessing the content, form, and context of Bolek's speech, the Court concludes that she is unable to demonstrate that her speech related to a matter of political, social, or other concern to the community. "An internal dispute with no wider societal implications is not a matter of public concern. Instead, it falls within the genre of 'personnel disputes and grievances' which are not constitutionally significant." *Roe v. City and Cty. of San Francisco*, 109 F.3d 578, 586 (9th Cir. 1997).

//

### 2.    Bolek's Tort Claim Notice

Assuming Bolek's tort claim notice qualifies as protected speech, it is clear that the "speech" at issue was Bolek's private dispute with the City about her alleged unlawful treatment. *See Houston v. Yoncalla Sch. Dist. No. 32*, No. 6:13-cv-01318-AA, 2016 WL 2660189, at *3 (D. Or. May 9, 2016) ("Because the subject of the speech at issue [a tort claim notice] was a personal employment grievance between plaintiff and [defendant], plaintiff's speech is not of public concern and is unprotected for First Amendment purposes."); *see also Boyd v. Edwards*, No. 6:15-cv-238-MC, 2016 WL 2349594, at *6 (D. Or. May 4, 2016) (holding that defendant is entitled to qualified immunity on plaintiff's First Amendment claim, because "whether a tort claim notice can support a First Amendment claim is far from a well-settled issue in the Ninth Circuit"). Thus, Bolek cannot demonstrate that her filing a tort claim notice was a matter of public concern.

### 3.    Bolek's Speech in Opposition to Hiring of Bishop

The Court next considers the content, context, and form of Bolek's speech in opposition to Bishop's hire. *See Rankin*, 483 U.S. at 384-85. With regard to the content, on April 16, 2013, Bolek sent an email to Louie reporting her concerns about hiring Bishop as a member of the CET. Specifically, Bolek relayed concerns about Bishop, based on reports from others relating to past allegations of sexual harassment, and complaints "of women not being valued." (Vickers Decl. Exs. 2, 38.) With respect to the content of Bolek's speech, allegations of sexual harassment may raise matters of public concern. *See Freitag v. Ayers*, 468 F.3d 528, 545-46 (9th Cir. 2006) ("It certainly would be of grave concern if those inmates were being released into our neighborhoods from an environment in which the State of California condoned sexually abusive behavior and the harassment of women."); *cf. Connick*, 461 U.S. at 146 (noting that "it is clear that . . . statements concerning the

school district's allegedly racially discriminatory policies involved a matter of public concern"). This factor weighs in favor of a finding of public concern.

As to the form, there can be no dispute that Bolek intended the April 16, 2013 email to remain private. In fact, at the top of the email, Bolek wrote: <u>Attorney Client Communication – NOT SUBJECT TO DISCLOSURE</u>. This factor weighs against the Court finding that the speech was intended to alert the public to an important governmental matter.

With respect to the context of Bolek's April 16, 2013 email, it was an internal and confidential message. Bolek's stated purpose for speaking was "to make sure that I provided this information to the Chiefs & Legal for appropriate review and consideration." (Vickers Decl. Exs. 2, 38.) The context of the speech does not support a finding that Bolek was attempting to expose wrongdoing on the part of City officials. Instead, the tenor of the email suggests the opposite: that Bolek intended to aid City officials in making an informed decision about a potential hire. Bolek's email concerned one potential hire for a volunteer position. The scope was limited, and the speech was not an effort to illuminate the issue of sexual harassment in the police department. While the email served the important interest of ensuring that the City hires employees who will comply with City policy, the context of Bolek's speech weighs against a finding that her speech was a matter of public concern.

After assessing the content, form, and context of Bolek's April 16, 2013 email, the Court concludes that Bolek is unable to demonstrate that her speech addressed a matter of public concern. *See Connick*, 461 U.S. at 148 (finding no matter of public concern, in part, because plaintiff did not "seek to bring to light actual or potential wrongdoing or breach of public trust").

//

Page 24 - FINDINGS AND RECOMMENDATION

In sum, Bolek is unable to demonstrate that she spoke on a matter of public concern when she opposed Louie's conduct and the City's response, filed her tort claim notice, or sent the April 16, 2013 email regarding the Bishop hire. As such, Bolek cannot state a prima facie case of retaliation for reporting matters of public concern in violation of 42 U.S.C. § 1983. Accordingly, the Court recommends that the district judge grant the individual defendants' request for summary judgment on Bolek's § 1983 claim.

## III.   Retaliation Claims

Bolek alleges five claims for retaliation under Oregon law. To state a prima facie case for retaliation under Oregon law, a plaintiff must establish that: 1) she engaged in protected activity, 2) she suffered an adverse employment action, and 3) there is a causal link between the protected activity and the adverse action. *See, e.g., Hoy v. Yamhill Cty.*, 107 F. Supp. 3d 1078, 1101 (D. Or. 2015) (setting forth the elements to state a prima facie case for ORS 659A.230 claim), *superseded by statute on other grounds James v. Or. Sandblasting & Coating, Inc.*, No. 3:15-cv-01706-HZ, 2016 WL 5402218 (D. Or. Sept. 25, 2016); *Arnold v. Pfizer, Inc.*, 970 F. Supp. 2d 1106, 1140 (D. Or. Sept. 9, 2013) (setting forth the elements to state a prima facie case for ORS 659A.109 claim); *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 965 (D. Or. 2011) (setting forth the elements to state a prima facie case for ORS 659A.203 claim); *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1091 (D. Or. 2015) (setting forth the elements to state a prima facie case for ORS 659A.199 claim); *Herman v. Port of Astoria*, 3:15-cv-00276-HZ, 2015 WL 7720500, at *2 (D. Or. Nov. 28, 2015) (setting forth the elements to state a prima facie case for ORS 659A.030(1)(f) claim).

With regard to what qualifies as an adverse employment action to prove a retaliation claim, a plaintiff "must show that a reasonable employee would have found the challenged action materially

adverse," which means that the action "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also Thompson v. N. Am. Stainless*, LP, 562 U.S. 170, 173-74 (2011) (applying *Burlington N.* standard); *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) ("An action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity."). To be materially adverse, an action need not rise to the level of an ultimate employee action, such as discharge. *See Ray*, 217 F.3d at 1242-43. However, actions such as a lateral transfer, an unfavorable job reference, or a change in work schedule may be sufficiently severe to deter a reasonable employee from complaining. *Id*.; *see also Burlington N.*, 548 U.S. at 69. The requirement to prove "material" adversity precludes claims grounded in "petty slights, minor annoyances, and simple lack of good manners" that do not rise to a level that will deter an employee from lodging a report. *Burlington N.*, 548 U.S. at 68. In adopting the "reasonable employee" standard, the Supreme Court has emphasized that alleged harms are to be judged by an objective standard that takes into account the particular circumstances under which they occur. *Id*.

The City contends that each of Bolek's retaliations claims fail because she is unable to prove the necessary element of an adverse employment action. (Defs.' Mot. Summ. J. 8.) The Court agrees. As set forth below, none of the alleged adverse employment actions alleged by Bolek, either singularly or in combination, rise to the level of material adversity.

### A.    Bolek's Alleged Adverse Employment Actions

#### 1.    Romero Investigation

Beginning in August 2012, Ben Romero, a former employee of the police department, named the City and Bolek as defendants, first in an Oregon Bureau of Labor and Industries (BOLI)

complaint and, subsequently, in a civil rights lawsuit. Bolek was Romero's supervisor. Bolek alleges

that the City "[tried] to scapegoat her for the Romero investigation in hopes that she would be

terminated or demoted," and that the City "refus[ed] to move for her dismissal as an improperly

named individual defendant in the Romero matter." (FAC ¶¶ 65(c), (d).)

The undisputed evidence is that the City immediately hired an outside investigator to

investigate the Romero charges, including Romero's charges against Bolek. In her July 16, 2013

report on Romero's allegations that Bolek had created a hostile work environment, the independent

investigator concluded that Bolek had not acted illegally. (Vickers Decl. Ex. 13 at 19 ("However,

I note that there is nothing illegal about being a poor leader, a micromanager or needing to 'win.' As

difficult as these management traits can be, they do not constitute illegal behavior.").) On July 31,

2013, BOLI found no substantial evidence to support Romero's claims and, accordingly, dismissed

his complaint. On August 16, 2013, Hammond notified Bolek that the independent investigation of

the Romero allegations revealed no wrongdoing by her or the police department, and the

investigation was closed:

> After the extensive investigation, there is no evidence that you or anyone else at the
> Hillsboro Police Department created a hostile work environment. Additionally, there
> is no evidence that you or anyone else at the Hillsboro Police Department violated
> the City's broader harassment policies as they pertain to Romero's allegations. This
> investigation is now considered to be closed.
>
> You are a highly valued employee in the City of Hillsboro organization, and your
> expertise serves a vital role in the Police Department. The City appreciates your
> cooperation throughout this investigation. Please contact me if you have any
> questions.

(Vickers Decl. Ex. 1 at 143.)

//

Page 27 - FINDINGS AND RECOMMENDATION

On October 23, 2013, Romero filed a lawsuit in federal court, naming Bolek and the City as defendants. The City retained outside counsel to defend Romero's lawsuit on behalf of the City and Bolek. Almost immediately, outside counsel attempted to settle the matter with Romero. In addition, on December 20, 2013, counsel filed an answer to Romero's complaint. In the answer, counsel denied all allegations of liability and raised affirmative defenses on Bolek's behalf. (Vickers Decl. Ex. 20.)

Settlement negotiations resumed in early January 2014, and Romero agreed to settle his claims on January 21, 2014. The next day, counsel emailed Bolek and the City to inform them that Romero agreed to settle his claims, and counsel attached a draft settlement agreement for review by Bolek and the City. (Vickers Decl. Exs. 23, 24.) Bolek provided input and the draft settlement agreement was revised to address her concerns. (Vickers Decl. Exs. 25, 26.) Bolek signed the settlement agreement on March 18, 2014. The settlement agreement included a non-disparagement clause, as requested by Bolek, and a disclaimer of all liability. The next day, the Court dismissed Romero's claims with prejudice. (Vickers Decl. Ex. 32.)

Throughout the Romero litigation, Bolek enjoyed the benefit of counsel retained at the City's expense. Through the efforts of counsel, Bolek was absolved of liability at each turn – the independent investigation, the BOLI charges, and the settlement of the federal lawsuit. That Bolek may have been dissatisfied with her counsel's handling of the Romero litigation does not constitute an adverse employment action taken by the City.

//

//

//

## 2.    Louie's Proposed Demotion of Bolek

Bolek contends that Louie's conduct during the May 6, 2013 meeting, particularly his attempt to demote her, was an adverse employment action.[1] The undisputed evidence is that Louie's proposed demotion of Bolek never occurred. In fact, Louie abandoned his proposal within hours of the meeting, apologized to Bolek, and Bolek continues in her position as Support Services Division Manager today. Bolek does not allege that she was actually demoted, or that the city impaired any other terms or conditions of her employment. Following Bolek's complaint, the City immediately opened an investigation and subsequently made an appropriate recommendation. While Bolek alleges she was humiliated and demeaned by Louie's conduct at the May 6, 2013 meeting, the circumstances of that meeting, standing alone, are insufficient to establish a materially adverse employment action. *See Hellman v. Weisberg*, 360 F. App'x 776, 779 (9th Cir. 2009) (holding that employer threatening plaintiff with termination and criminal prosecution did not constitute a materially adverse employment action since plaintiff was not fired or prosecuted); *see also Cates v. PERS of Nevada*, 357 Fed. App'x 8, 10 (9th Cir. 2009) (affirming district court's grant of summary judgment on plaintiff's FMLA claims, because "[t]he limited reassignment of [plaintiff's] email and custom correspondence duties as well as her retirement counseling coordinator duties constituted an insignificant change in her employment status, and did not, individually or cumulatively, constitute an adverse employment action"); *Bollinger v. Thawley*, 304 Fed. App'x 612, 614 (9th Cir. 2008)

_____

[1] Bolek argues that the City concluded in its investigation report that Louie's May 6 conduct could have "potentially" violated her FMLA/OFLA rights, and that the Court must accept that conclusion as an admission by the City. (Pl.'s Opp. 26-27 (citing Altschul Decl. Ex. BB at 4).) However, Martin's independent legal conclusions are not factual admissions by the City. Further, even if Martin had concluded that Louie violated FMLA or OFLA, the Court is not bound by those legal conclusions.

("Mere harsh words or threats" did not constitute action "reasonably likely to deter employees from engaging in protected activity"); *cf. Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1030, 1073 (D. Or. 2012) (finding that a *series* of exclusionary and harassing events that caused plaintiff "to feel excluded, ignored, and humiliated . . . . could conceivably constitute adverse employment actions").

In sum, "mean" conduct does not always rise to the level of unlawful conduct, especially where, as here, no adverse employment action resulted. Louie proposed a reassignment of Bolek's duties, Bolek objected, and Louie abandoned the proposed changes. Louie immediately apologized, and Bolek has not alleged any post-apology harassment. Under these circumstances, Bolek suffered neither severe nor pervasive harassment by Louie. Furthermore, the record is clear that Louie's conduct at the meeting did not discourage Bolek from exercising her rights. On the contrary, Bolek continued to exercise her rights under FMLA and OFLA following the May 6 meeting, and to speak out about other issues. Louie's proposed demotion of Bolek at the May 6, 2013 meeting, does not rise to the level of a materially adverse employment action.

### 3.    Actions Taken Following the May 2013 Meeting

Bolek contends that Defendants engaged in a series of adverse employment actions against her when she returned to work full time in October 2013. According to Bolek, the adverse employment actions were "retaliatory harassment" for her complaints about Louie. (Pl.'s Opp. 20-21.) Bolek alleges that the following actions qualify as materially adverse:

- Greagor routinely talked to Bolek about her looks, suggesting that being a strong woman and having her around "created issues" for the men, and criticized Bolek for raising concerns about the lack of female administrative staff participation in the process to hire new staff.

- Greagor accused Bolek of violating the City's work-at-home and part-time policies even though she was on an approved medical leave.

- Greagor excluded Bolek from projects normally within her chain of command, and redirected Bolek's work to another employee, including efforts to exclude Bolek from a grievance process, efforts to implement a new work plan process without Bolek's input, and a decision regarding a light-duty assignment for one of Bolek's employees.

- Greagor complained to Chief Lee Dobrowolski that Bolek's use of FMLA/OFLA time off was "making her schedule difficult" and was violating the City's work-at-home policy.

- Greagor advised Chief Dobrowolski that Bolek's lack of availability was negatively affecting union negotiations.

- Greagor complained to Deputy Chief Bonnett about Bolek's presence in a meeting and asked that she be disciplined for being there.

- Greagor refused to provide the same level of operational support to Bolek during the labor negotiations process that she had in the past.

- Chief Dobrowolski told Bolek on two occasions that "City Hall wants your head on a platter."

- Brown shunned and ignored Bolek.

- Mayor Jerry Willey advised Bolek that he was unhappy that she filed a tort claim notice, and she should take an extended leave of absence.

- Mayor Willey told Bolek that her communication style was unacceptable and that there was a perception she "did not like men." He also suggested that when she talked to men, it was like striking somebody with a bat.

(Pl.'s Opp. 22-23 (citations to the record omitted).)[2]

---

[2] At oral argument, the Court attempted to clarify whether Bolek was alleging a hostile work environment claim based on the series of actions occurring after October 2013. Based on counsel's representations at oral argument, along with the allegations in Bolek's FAC and her summary judgment papers, the Court concludes that Bolek relies on the post-October 2013 conduct in an attempt to establish a totality of circumstances that equates to an adverse employment action, and not a hostile work environment claim. In any event, the post-October 2013 allegations are insufficient to establish a hostile work environment. See Ray, 217 F.3d at 1245 ("Harassment is

Page 31 - FINDINGS AND RECOMMENDATION

The actions Bolek claims are materially adverse are more accurately characterized as petty slights and minor inconveniences. *See, e.g., Nunez v. City of Los Angeles,* 147 F.3d 867, 875 (9th Cir. 1998) (finding that bad mouthing and verbal threats were insufficient to qualify as an adverse employment action); *Best v. California Dep't of Corr.*, 21 Fed. App'x. 553, 560 (9th Cir. 2001) (holding that "numerous alleged incidents of harassment, including the 'keying' of her car and various insulting comments and name-calling by her co-workers and supervisors" were insufficient to establish an adverse employment action); *Herman*, 2015 WL 7720500, at *4 (holding that supervisor's "action of rolling down his car window and shouting an insult at Plaintiff on one occasion is not the kind of retaliation that is actionable"); *Lefevre v. Design Prof'l Ins. Co.*, No. C-93-20720 RPA, 1994 WL 544430, at *1 (N.D. Cal. Sept. 27, 1994) ("An employer's decision which has intangible and indirect effects on an employee's status does not qualify as 'adverse' action.").

Despite the numerous actions challenged by Bolek as "materially adverse," none of those actions ever dissuaded Bolek from continuing to raise her concerns to City officials. In addition, Bolek provides no explanation regarding how the alleged adverse acts impacted the terms or conditions of her employment in any way. For example, the mayor had no authority to hire or fire her, and his comments about Bolek, while perhaps unprofessional, held no substance. Similarly, Bolek is unable to identify who in the City made the remark about her "head on a platter." Finally, there is evidence that Greagor's remarks to Bolek about working from home were based on concerns that she was working overtime at home, which is not permitted by City policy. Throughout the course of this litigation until the present, Bolek continues in her role with the City, acting with

---

actionable only if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (quotations and citations omitted)).

complete authority and responsibility, earning her full pay and benefits, and freely exercising her FMLA/OFLA rights. Accordingly, the post-October 2013 conduct by City officials, alone or in totality, does not rise to the level of an adverse employment action.

### 4.    Sham Investigation

Bolek contends that in July 2014, after she filed her tort claim notice, the City conducted a sham investigation into her complaints of retaliation. However, courts have consistently held that an employer's failure to investigate properly an employee's claim is not an adverse employment action. *See Lucke v. Multnomah Cty.*, No. 3:06-cv-1149-ST, 2008 WL 4372882, at \*25 (D. Or. Sept. 22, 2008) (finding that defendant's failure to "carry[] an investigation through to the outcome desired by the employee would not" constitute an adverse employment action); *see also DeWeese v. Cascade Gen. Shipyard*, No. 3:08-cv-860-JE, 2011 WL 3298421, at \*16 (D. Or. May 9, 2011) ("[Plaintiff's] allegation that Trautman retaliated in response to plaintiffs' claims by failing to properly investigate does not describe an actionable adverse employment action."); *Hansen v. ADVO, Inc.*, No. 3:07-cv-247-HU, 2008 WL 793219, at \*13 (D. Or. Mar. 25, 2008) ("[Plaintiff's] only contention is that Quock failed to investigate her complaints, and this is not an adverse employment action against [Plaintiff]."); *but see Halverson v. Wilshire Credit Corp.*, 3:01-cv-939-HA, 2002 WL 31478146, at \*7 (D. Or. Aug. 21, 2002) ("Defendant's alleged failure to fully investigate this second grievance, and alleged unwillingness to address plaintiff's claims with the attention and vigor with which it approached complaints from Caucasians, could be construed as adverse employment actions that might deter reasonable employees from complaining about Title VII violations.").

Bolek attempts to distinguish *Lucke* on the ground that "the City purposefully *pretended* to investigate and bases its conclusion on knowingly false assertions." (Pl.'s Opp. 43.) However, there

is no principled distinction between a cursory investigation and a refusal or failure to investigate at all. In any event, despite Bolek's challenge to investigator Jensen's qualifications, it is undisputed that the City conducted a timely and independent investigation into Bolek's allegations of retaliation. The City determined that Bolek's complaints, on their face, did not warrant a full investigation, but the City nevertheless hired an independent investigator, who concurred. The fact that Bolek disagrees with the methods or conclusions of the independent investigator, or the number of interviews he conducted, is not a basis for a retaliation claim against the City. Accordingly, the investigation was not a "sham," and did not rise to the level of an adverse employment action. *See Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 146 (2d Cir. 2014) (finding that an employer's investigation of a harassment complaint "without more–that is, without additional particularized facts evidencing a retaliatory intent and resulting in, or amounting to, adverse job consequences for the complainant–cannot sustain a valid retaliation complaint").

### B.    Bolek's Retaliation Claims

#### 1.    Whistleblowing/Public Employer Retaliation in Violation of ORS 659A.203 and 659A.199

##### (a)    Retaliation by a Public Employer – ORS 659A.203

Bolek pleads her Third Claim for Relief against the City for retaliation by a public employer in violation of ORS 659A.203. Section 659A.203 bars a public employer from "[p]rohibit[ing] any employee from disclosing, or tak[ing] or threaten[ing] to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of," among other things, "[a] violation of any federal or state law." Bolek alleges that the City attempted to prohibit her from disclosing information she reasonably believed violated state and federal law. (Am.

Compl. ¶ 65.) Bolek alleges the City took eleven adverse actions in an attempt to intimidate her. (Am. Compl. ¶ 65.) Hillsboro and Bolek cross move for summary judgment on this claim.

Hillsboro contends Bolek cannot establish any of the elements of her prima facie case for retaliation under ORS 659A.203. (Defs.' Mot. Summ. J. 8, 63-65.) Conversely, Bolek argues that the City's response to her April 2014 tort claim notice "and additional reports of new unlawful conduct" by City officials violated ORS 659A.203. (Pl.'s Mot. Partial Summ. J. 30.)

Bolek is unable to satisfy the adverse employment action element of her prima facie case. As discussed above, neither the City's response to the filing of her tort claim notice nor any other allegedly adverse conduct was materially adverse. Accordingly, the Court recommends that the district judge grant Hillsboro's request for summary judgment on Bolek's ORS 659A.203 retaliation claim.

### (b)    Retaliation for Whistleblowing – ORS 659A.199

Bolek pleads her Fourth Claim for Relief against Hillsboro for whistleblowing retaliation in violation of ORS 659A.199. Section 659A.199 provides that "an employer" may not "retaliate against an employee . . . for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." Bolek alleges that after she opposed the City's attempts to discriminate and retaliate against her, City "officials retaliated against her in a variety of ways." (Am. Compl. ¶ 74.) Bolek alleges eleven adverse actions taken by the City. (Am. Compl. ¶ 74.) Hillsboro and Bolek cross move for summary judgment on this claim.

The City contends ORS 659A.199 does not apply to public employers and, instead, Bolek may bring her retaliation claim only under ORS 659A.203. ORS 659A.203 is titled "Public

Page 35 - FINDINGS AND RECOMMENDATION

employers; prohibited employment practices" and specifically prohibits "any public employer" from taking certain actions against an employee who opposes unlawful practices. Bolek argues ORS 659A.199 applies to private and public employers because "employer" includes all types of employers. In addition, Bolek maintains that the Court is bound by the plain text of the statute, and if the Oregon Legislature intended it to cover only private-sector workers, it would have so stated.

The Court need not resolve the issue of whether ORS 659A.199 applies to public employers, as Bolek did not suffer any adverse employment action as required to state a claim under ORS 659A.199. Accordingly, the Court recommends that the district judge grant the City's request for summary judgment on Bolek's ORS 659A.199 retaliation claim.

### 2.      Opposing Unlawful Employment Practices Retaliation in Violation of ORS 659A.030(1)(f)

Bolek pleads her Fifth Claim for Relief against the City for retaliation after opposing unlawful employment practices in violation of ORS 659A.030(1)(f). Section 659A.030(1)(f) makes it unlawful "[f]or any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice . . . ." Bolek alleges that after she "reported and resisted" conduct she believed in good faith to be violations of state discrimination, retaliation, and protected medical leave statutes, she experienced a variety of adverse employment actions. (Am. Compl. ¶¶ 82, 83.) Bolek alleges eleven adverse actions taken by the City. (Am. Compl. ¶ 83.) Hillsboro and Bolek cross move for summary judgment on this claim.

The City contends that Bolek cannot establish a prima facie case of retaliation because she neither engaged in protected activity, nor experienced an adverse employment action. Conversely, Bolek contends that she opposed: (1) Louie's behavior at the May 2013 E-team meeting, (2) the

police department disproportionately disciplining female officers, (3) gender pay disparity, and (4) the City's hire of Bishop. As a result, Bolek alleges she experienced a series of adverse employment actions.

Bolek is unable to satisfy the adverse employment action element of her prima facie case. As discussed above, alleged adverse actions taken by Defendants were not materially adverse, either individually or in combination. Accordingly, the Court recommends that the district judge grant the City's request for summary judgment on Bolek's ORS 659A.030(1)(f) retaliation claim.

### 3. Whistleblowing Retaliation in Violation of ORS 659A.230

Bolek pleads her Sixth Claim for Relief against the City for whistleblowing retaliation in violation of ORS 659A.230. Section 659A.230 provides that "[i]t is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee . . . for the reason that the employee . . . has in good faith brought a civil proceeding against an employer. . . ." Bolek alleges that after she filed her tort claim notice and complaint in this case, the City "refused to thoroughly investigate and/or conducted a sham investigation into the complaints of retaliation raised by plaintiff at/around the time she filed her tort claims notice and this lawsuit." (Am. Compl. ¶ 93.) Hillsboro and Bolek cross move for summary judgment on this claim.

Hillsboro contends that Bolek cannot establish her prima facie case for retaliation under ORS 659A.230. Specifically, the City argues that Bolek's only protected activity was the filing of this lawsuit and that Bolek is unable to show an adverse employment action that occurred after she filed her complaint. (Defs.' Mot. Summ. J. 66-69.) Conversely, Bolek contends that both her April 2014 tort claim notice and this lawsuit are protected activity under ORS 659A.230. (Pl.'s Opp. 42-

Page 37 - FINDINGS AND RECOMMENDATION

43.) In addition, Bolek maintains the City's "pretend" investigation into her complaints was fraudulent and a material adverse employment action for purposes of a retaliation claim. (Pl.'s Mot. Partial Summ. J. 43.)

Bolek is unable to satisfy the adverse employment action element of her prima facie case. As discussed above, the City's alleged sham investigation does not rise to the level of materially adverse. Accordingly, the Court recommends that the district judge grant the City's request for summary judgment on Bolek's ORS 659A.230 retaliation claim.

### 4.    Disability Retaliation in Violation of ORS 659A.109

Bolek pleads her Twelfth Claim for Relief against the City for disability discrimination in violation of ORS 659A.109. Section 659A.109 prohibits employers from retaliating against employees who invoke or utilize any rights under the Oregon statutes prohibiting disability discrimination. Bolek alleges that "Hillsboro discriminated and/or retaliated against plaintiff because of her disability by attempting to demote her, and questioning her working from home, which is both a common practice and reasonable accommodation."[3] (Am. Compl. ¶ 153.) Hillsboro and Bolek cross move for summary judgment on the disability retaliation claim.

Bolek argues there is no factual dispute she engaged in protected activity by requesting a reasonable accommodation for her disability, and "she suffered a material adverse action as a direct result of Louie's unlawful response to her protected activity." (Pl.'s Mot. Partial Summ. J. 25-26.) Conversely, the City contends that Bolek's request in December 2012 to work from home was not

---

[3] ORS 659A.109 also prohibits "discrimination" with "respect to hire or tenure or condition of employment because" a person has applied for benefits or invoked Oregon statutory procedures. Bolek acknowledges that she did not experience "a tangible change in terms and conditions of her employment" sufficient for a discrimination claim, but contends that her allegations of retaliation are adequate to sustain a disability retaliation claim. (Pl.'s Opp. 26.)

a "disability accommodation under disability laws," i.e., protected activity. (Defs.' Combined Resp. and Reply 33-34.) In addition, the City maintains that Bolek's proposed reassignment of duties was not an adverse employment action and, regardless, there is no causal link between the protected activity and the adverse action.

Bolek is unable to satisfy the adverse employment action element of her prima facie case. As discussed above, Louie's conduct at the May 6 meeting was not materially adverse. Accordingly, the Court recommends that the district judge grant the City's request for summary judgment on Bolek's ORS 659A.109 retaliation claim.

## IV.    Medical Leave Claims

FMLA created two related substantive rights: "first, the employee has a right to use a certain amount of leave for protected reasons, and second, the employee has a right to return to his or her job or an equivalent job after using protected leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)). To enforce these substantive rights, employees may bring an action for damages under 29 U.S.C. § 2617(a). Two theories for recovery on FMLA claims are available under 29 U.S.C. § 2615: the "retaliation" or "discrimination" theory, and the "entitlement" or "interference" theory. *Sanders v. City of Newport*, 657 F.3d 772, 777-78 (9th Cir. 2011). An employee may bring an "interference" or "entitlement" claim under 29 U.S.C. § 2615(a)(1), which makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by FMLA. *See also Sanders*, 657 F.3d at 777-78 ("When a party alleges a violation of § 2615(a)(1), it is known as an 'interference' or 'entitlement' claim."). In addition, under either 29 U.S.C. § 2615(a)(2) or 29 U.S.C. § 2615(b), an employee may bring a "discrimination" or "retaliation" claim against an employer for opposing any

practice made unlawful by the FMLA or for instituting or participating in any FMLA proceedings or inquiries. Specifically, § 2615(a)(2) provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

Bolek's allegation that, in response to her taking medical leave, Hillsboro attempted to demote her and eliminate her supervisory duties, is a FMLA interference claim. Bolek's allegation that the City took "further adverse action against [her]" in response to Bolek's opposition to the attempted demotion and transfer of her supervisory duties, is a FMLA retaliation claim. Below, the Court considers in turn whether summary judgment is appropriate on either Bolek's interference or her retaliation claims.

### A.    Family Medical Leave Act Interference – 29 U.S.C. §§ 2601-2654      Oregon Family Leave Act Interference – ORS 659A.150-659A.186

Bolek pleads her Eighth Claim for Relief against the City for interfering with her rights under FMLA in violation of 29 U.S.C. § 2615(a)(1). Bolek alleges that "in direct response" to her taking protected medical leave, the City "attempted to demote [her] and eliminate her supervisory duties." (Am. Compl. ¶ 111.) Hillsboro and Bolek cross move for summary judgment on the medical leave interference claims.

In her Tenth Claim for Relief against the City, Bolek pleads a parallel claim for interfering with her rights under OFLA. (Am. Compl. ¶ 133.) However, "[u]nlike FMLA, OFLA does not provide a cause of action for 'interference' with an . . . employee's ability to request OFLA leave[.]" *Fillman v. Officemax, Inc.* No. 05-cv-6346-TC, 2007 WL 2177930, at *8 (D. Or. July 27, 2007).

Accordingly, the Court recommends that the district judge grant Hillsboro's request for summary judgment on Bolek's OFLA interference claim.

With regard to Bolek's FMLA interference claim, the Department of Labor ("DOL") regulations promulgated to further the purpose of § 2615 provide that "FMLA prohibits interference with an employee's rights under the law."[4] 29 C.F.R. § 825.220(a). A violation of either FMLA or of the DOL regulations constitutes interference with an employee's rights under FMLA. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133 (9th Cir. 2003); 29 C.F.R. § 825.220(b). The DOL interprets "interference" to include "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Id*. Under the DOL regulations, "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c); *see also Bachelder*, 259 F.3d at 1125 (court considers whether FMLA was a negative factor in decision to terminate); *Xin Liu*, 347 F.3d at 1133 (same).

With regard to the method of proof for an interference claim, the employee "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in" an employment decision. *Bachelder*, 259 F.3d at 1125. The employee may prove interference using "either direct or circumstantial evidence, or both." *Id*. This method of proof contrasts with the *McDonnell Douglas v. Green*, 411 U.S. 792, 793 (1973), burden-shifting framework, which does not apply to FMLA interference claims. *Xin Liu*, 347 F.3d at 1136; *Bachelder*, 259 F.3d at 1125.

---

[4] Congress authorized the DOL to issue implementing regulations for FMLA, 29 U.S.C. § 2654, and these regulations are entitled to deference under *Chevron USA, Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843–44 (1984). *See Sanders*, 657 F.3d at 779 n.5.

Bolek's interference claims arise from the Louie's attempt to eliminate her supervisory duties. (Am. Compl. ¶¶ 111, 133.) Hillsboro argues that this action did not deny her a right protected by FMLA, because FMLA permits an employer to "transfer an employee's job duties to someone else or otherwise modify an employee's job when he is taking leave intermittently or in the form of a reduced schedule." (Defs.' Mem. Summ. J. 29 (citing 29 U.S.C. § 2612(b)(2) ("the employer may require such employee to transfer temporarily to an available alternative position offered by the employer . . . [that] better accommodates recurring periods of leave than the regular employment position of the employee").) In addition, the City maintains that the attempted demotion does not satisfy Bolek's prima facie requirement to show a materially adverse employment action. (Defs.' Mem. Summ. J. 31.)

Conversely, Bolek contends that it is undisputed "that Louie humiliated and demeaned Bolek in front of Bolek's peers when he screamed and spit at her and then engaged in an angry tirade where he announced that *because of her medical condition,* he was reassigning all of Bolek's job responsibilities to other managers and downgrading her reporting relationship." (Pl.'s Mem. Summ. J. 26 (emphasis in original).) Bolek also disputes the City's contention that it acted lawfully when it attempted to demote her and eliminate her job duties. Specifically, Bolek acknowledges that the City was permitted to transfer her to a different position at the inception of her medical leave. (Pl.'s Opp. 34.) However, Louie's proposed change did not occur until two months later, at a time when the undisputed evidence shows that the intermittent leave schedule was not impacting Bolek's job performance. (Pl.'s Opp. 34.) Bolek also argues that the undisputed evidence shows that the reassignment was intended to be "permanent."

The parties agree that during the relevant period, the City granted Bolek the accommodation of intermittent leave. When an employee is on intermittent leave or on a reduced leave schedule, FMLA allows an employer to transfer an employee temporarily to an available alternative position offered by the employer for which the employee is qualified, that has equivalent pay and benefits, and that better accommodates recurring periods of leave than the regular employment position of the employee. 29 U.S.C. § 2612(b)(2); 29 C.F.R. § 825.204(a). Furthermore, the alternative position "does not need to have equivalent duties," so long as the pay and benefits are equivalent. 29 C.F.R. § 825.204(c). However, FMLA requires an employer to return an employee to the same position the employee held when leave commenced, or to an equivalent position, upon the employee's return from FMLA leave. 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.214.

While there is no dispute that the City provided Bolek all of FMLA's entitlements, Bolek's claim is that Louie's behavior would discourage a reasonable employee from using FMLA leave. *See* 29 C.F.R. § 825.220(b) ("Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."). Thus, the Court turns to the question of whether Bolek suffered an adverse employment action sufficient to sustain her FMLA interference claim. *See Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F. Supp. 2d 1039, 1053 (D. Or. 2013) (holding that plaintiff is required to prove an adverse employment action to support a FMLA interference claim).

As discussed above, Bolek has not demonstrated that Louie's proposed reassignment of duties at the May 6 meeting qualifies as an adverse employment action. Indeed, Louie's conduct did not discourage Bolek from taking additional FMLA leave. Bolek continued to exercise her rights under FMLA after the May 6 incident, including using FMLA leave through August 2013.

Page 43 - FINDINGS AND RECOMMENDATION

(Hammond Decl. Ex. 1.) In fact, Bolek requested, and the City granted, leave beyond what was required under FMLA. Additionally, despite the very unpleasant manner in which Louie attempted to transfer some of Bolek's job duties, FMLA regulations allow such a temporary transfer of duties while an employee remains on intermittent leave. Accordingly, the Court recommends that the district judge grant Hillsboro's request for summary judgment on Bolek's FMLA interference claim.

**B.      Family Medical Leave Act Retaliation - 29 U.S.C. §§ 2601-2654**
**Oregon Family Leave Act Retaliation – ORS 659A.150-659A.186**

Bolek pleads her Ninth Claim for Relief against the City for retaliation under FMLA in violation of 29 U.S.C. § 2615(a)(2). In her Eleventh Claim for Relief against Hillsboro, Bolek pleads a parallel OFLA retaliation claim.[5] Bolek alleges that after reporting Louie's behavior to Hammond, "Hillsboro took further adverse action against [her] . . . ." (Am. Compl. ¶ 122.) Bolek alleges eleven adverse actions taken by the City. (Am. Compl. ¶¶ 122, 143.) Hillsboro and Bolek cross move for summary judgment on the medical leave retaliation claims.

To establish a prima facie case of retaliation, plaintiff must show that (1) she availed herself of a protected right, (2) she was adversely affected by an employment decision, and (3) there is a causal connection between the two actions. *Schultz*, 970 F. Supp. 2d at 1058; *Price v. Multnomah Cty.*, 132 F. Supp. 2d 1290, 1296 (D. Or. 2001). Although the Ninth Circuit has not spoken directly on the issue, "other circuits and courts in this district have adopted the *McDonnell Douglas* burden shifting framework when analyzing FMLA retaliation claims." *Schultz*, 970 F. Supp. 2d at 1058 (applying *McDonnell Douglas* framework to § 2615(a)(2) claim). In the absence of Ninth Circuit

_____

[5] OFLA claims are to "be construed to the extent possible in a manner that is consistent with any similar provisions of the [FMLA]." ORS 659A.186(2). Consistent with this legislative directive, Oregon courts look to federal law when interpreting OFLA. *Yeager v. Providence Health Sys. Or.*, 195 Or. App. 134, 140-41 (2004).

authority to the contrary, this Court will apply the *McDonnell Douglas* burden-shifting framework to analyze Bolek's FMLA retaliation claims. Under that framework, once the employee makes a prima facie showing of retaliation, the burden shifts to the employer to articulate a legitimate, non-retaliatory explanation for the adverse employment action. *Id*. If the employer does so, the employee must then present evidence demonstrating that the explanation was merely a pretext for retaliation. *Id*.

The City contends that Bolek is unable to establish her prima facie case for a FMLA retaliation claim. Specifically, the City argues that Bolek's opposition to the proposed demotion was not a protected activity and, even assuming she can prove an adverse employment action, Bolek does not present evidence that the alleged retaliatory actions were in response to her opposition to the proposed demotion. (Defs.' Mem. Summ. J. 33-34; Defs.' Combined Resp. and Reply 25.)

In response, Bolek asserts that to prevail on her FMLA retaliation claims she "merely has to show 'that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (Pl.'s Opp. 26 (quoting *Burlington N.*, 548 U.S. at 68).) In addition, Bolek maintains that the Court must view her allegations of retaliation collectively, not in isolation. (Pl.'s Opp. 28.)

Even assuming Bolek can show she engaged in protected activity by opposing her attempted demotion, she is unable to demonstrate that either Louie's conduct at the May 6 meeting, or any subsequent actions by Defendants, were materially adverse. Accordingly, the Court recommends that the district judge grant Hillsboro's request for summary judgment on Bolek's FMLA and OFLA retaliation claims.

Page 45 - FINDINGS AND RECOMMENDATION

## V.    IIED Claim

Bolek pleads her Thirteenth Claim against Hillsboro for common law IIED. Bolek alleges the City threatened her job "by seeking to demote her, remove her job and supervisory duties, and publicly humiliate her by scapegoating her for the Romero situation," with knowledge that she suffered from a heart condition. (Am. Compl. ¶ 160.) The City moves for an entry of judgment on Bolek's IIED claim.

To establish a claim for IIED in Oregon, a plaintiff must prove that: (1) defendant intended to cause plaintiff severe emotional distress or knew with substantial certainty that its conduct would cause such distress, (2) defendant engaged in outrageous conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior, and (3) defendant's conduct in fact caused plaintiff severe emotional distress. *See McGanty v. Staudenraus*, 321 Or. 532, 543 (1995). "Because proof of intent is often indirect and evidence of psychic harm is usually self-serving, proof of this tort largely turns on the second element, whether a defendant's conduct is sufficiently outrageous." *House v. Hicks*, 218 Or. App. 348, 358 (2008).

Oregon law identifies "several contextual factors that guide the court's classification of conduct as extreme and outrageous." *House*, 218 Or. App. at 360. The most important factor is whether a special relationship exists between a plaintiff and a defendant, such as an employer-employee. *Id*. Such a special relationship "imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in arm's-length encounters among strangers." *McGanty*, 321 Or. at 547-48.

The City contends that Louie's conduct at the May 2013 meeting is insufficient to establish outrageous conduct, the second element of her prima facie case. Hillsboro argues that even if Louie

had fired Bolek, "that decision could not be the basis of an IIED claim because it would not be conduct that is beyond all tolerable bounds of civilized behavior." (Defs.' Mot. Summ. J. 78.) Similarly, the City maintains that Bolek's other allegations of behavior do not rise to the level of outrageous conduct. (Defs.' Mot. Summ. J. 78-79.) Alternatively, Hillsboro contends that Bolek has abandoned all allegations in support of her IIED claim, except Louie's conduct on May 6, 2013. (Defs.' Combined Resp. and Reply 67.)

Bolek presented evidence that while she was on medical leave recovering from a cardiac arrest, she attended a meeting in which Louie humiliated and demeaned her in front of her peers. At the meeting, Louie announced that he intended to "reorganize" the police department management team and remove Bolek's responsibilities, reassign her subordinates to other managers, and change her supervisory structure so that she was no longer reporting directly to the police chief. (Bonnett Decl. ¶ 11; Carlson Decl. ¶ 9; Altschul Decl. Ex. BB at 12, 14, 35; Bolek Dep. 228:3-18, 228:3-18.) When Bolek attempted to discuss the changes with Louie, there is evidence he acted in a physically intimidating manner. Specifically, Carlson stated:

> In addition to yelling at Ms. Bolek, he also was physically intimidating. He stood directly over Ms. Bolek, pointing his finger at her while he screamed at her. He was even spitting while he spoke because he was so agitated. At one point I put my arm in front of her to try to create some barrier between them. Deputy Chief Bonnett also moved closer to stand between Chief Louie and Ms. Bolek. We were all aware of Ms. Bolek's heart condition and it was obvious how upset, embarrassed and humiliated she was feeling, so I was worried about her. She told me that her heart was racing out of control.

(Carlson Decl. ¶ 12; *see also* Bonnett Decl. ¶ 14 ("Because I know of Ms. Bolek's heart condition, eventually I moved over to physically stand between Mr. Bolek and Chief Louie.").)

//

Page 47 - FINDINGS AND RECOMMENDATION

In considering whether Louie's May 2013 conduct constituted "an actionably outrageous transgression of social norms," the Court turns to *Clemente v. State*, 227 Or. App. 434, 442-43 (2009). In *Clemente*, the Oregon Court of Appeals held that the conduct must be more serious than just merely aggravating, insensitive, petty, irritating, and mean:

> In every case in which this court or the Supreme Court has allowed an IIED claim asserted in the context of an employment relationship to proceed to a jury, the employer engaged in conduct that was not only aggravating, insensitive, petty, irritating, perhaps unlawful, . . . and mean – it also contained some further and more serious aspect. In some cases, the employer engaged in, or credibly threatened to engage in, unwanted physical contact of a sexual or violent nature.

*Id*. (cases cited therein); *see also Zeggert v. Summit Stainless Steel, LLC*, No. 3:13-cv-000016-PK, 2014 WL 3512497, at *8 (D. Or. July 14, 2014) ("As suggested by the *Clemente* court, Oregon cases which have allowed claims for intentional infliction of emotional distress to survive summary judgment typically involve acts of psychological and physical intimidation, racism, or sexual harassment . . . ." (omitted cases are included below)).

There is no question that Louie's behavior was insensitive and mean, but it was not "an actionably outrageous transgression of social norms" necessary for Bolek's IIED claim under Oregon law. Specifically, Louie never "credibly threatened" to engage in unwanted physical or sexual contact with Bolek, Louie's challenged conduct directed at Bolek was brief and isolated to a single incident, there were no adverse employment consequences to Bolek, and Louie apologized on the same day.[6] *Compare Kraemer v. Harding*, 159 Or. App. 90, 111 (1999) (finding questions of fact

---

[6]  It is undisputed that Bolek was recovering from a heart condition and perhaps more vulnerable than an average employee. Nevertheless, Louie's conduct was not sufficiently outrageous to support an IIED claim. *See A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1209 (9th Cir. 2016) (even accounting for the "eggshell plaintiff" principle, court found that defendant's conduct was not sufficiently outrageous).

on IIED claim based on unsupported accusations by parents that a school bus driver was a child sex abuser despite multiple investigations that concluded no inappropriate conduct occurred); *Wheeler v. Marathon Printing, Inc.*, 157 Or. App. 290, 305 (1998) (finding IIED claim should go to the jury based on co-worker's continued "sadistic" harassment including sexual intimidation, insults, and directed acts of petty vandalism even after plaintiff attempted suicide); *Lathrope-Olson v. Dep't of Transp.*, 128 Or. App. 405, 408 (1994) (finding IIED claim should go to the jury based on defendant calling a Native American woman a squaw, telling her that a squaw was supposed to walk behind her man, stating that all women were good for was between their legs, locking her out of the work van in the rain and snow, and threatening to push her into the path of oncoming vehicles); *Mains v. II Morrow, Inc.*, 128 Or. App. 625, 630-31 (1994) (finding IIED claim should go to the jury based on daily physical assaults and sexual comments by supervisor); *Franklin v. Portland Cmty. Coll.*, 100 Or. App. 465, 471-72 (1990) (finding IIED claim should go to the jury based on supervisor calling an African-American male by the name "boy," issuing false reprimands, shoving him, locking him in an office, suggesting that he apply elsewhere for employment, and otherwise subjecting plaintiff to "verbal and physical abuse").

Even viewing the evidence in the light most favorable to Bolek, the Court finds that Louie's actions toward Bolek, while unpleasant and unprofessional, do not rise to the level of "outrageous" or beyond the bounds of socially appropriate. *House*, 218 Or. App. at 358 ("[T]he trial court plays a gatekeeper role in evaluating the viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability."). Accordingly, the Court recommends that the district judge grant Hillsboro's request for summary judgment on Bolek's IIED claim.

## CONCLUSION

This thirteen-count federal case centers around a single acrimonious meeting in the workplace, at which a supervisor lost his temper. Following that meeting, the supervisor at fault realized that he had acted inappropriately, and he immediately abandoned his proposed reorganization plan, and apologized to the affected employee. The employer conducted an investigation, and recommended appropriate consequences. The affected employee's job duties, position, approved FMLA leave, salary, benefits, performance reviews, advancement potential, and longevity were never impacted. On the contrary, Bolek continues to serve as one of the highest-ranking managers at the City of Hillsboro Police Department today.

For the reasons set forth above, the district judge should GRANT Defendants' Motion for Summary Judgment (ECF No. 43), DENY Bolek's Motion for Partial Summary Judgment (ECF No. 46), and enter JUDGMENT on Bolek's First Amended Complaint (ECF No. 8).

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 14th day of November 2016.

_Stacie F. Beckerman_
_____
STACIE F. BECKERMAN
United States Magistrate Judge

Page 50 - FINDINGS AND RECOMMENDATION